**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

UNITED STATES OF AMERICA,

*v.*                                                            Dkt. No 1:20-CR-00045-LMM-JSA

THOMAS ADDAQUAY

                        Defendant.

**DEFENDANT THOMAS ADDAQUAY'S SUPPLEMENTAL BRIEF REGARDING
MOTION TO RESTRICT CERTAIN TESTIMONY DUE TO DESTRUCTION OF
EVIDENCE**

NOW COMES Defendant Thomas Addaquay, by and through the undersigned counsel,

and respectfully submits this Brief to address the issues raised at the Evidentiary Hearing held on

this matter by Magistrate Judge Anand on September 22, 2021 and December 10, 2021. The

Evidentiary Hearing was conducted in furtherance of Defendant's Motion to Restrict Certain

Testimony Due to Destruction of Evidence [38].

## I.       PRELIMINARY STATEMENT

Thomas Addaquay was arrested by Cobb County police officers at a branch office of the

Fifth Third Bank on May 1, 2019. Shortly after his arrest, Mr. Addaquay, through counsel,

requested that the surveillance video from the bank branch be preserved for use at trial. Counsel

sent preservation notices to the local police department where Mr. Addaquay was arrested, to the

bank branch and headquarters, and to the government once it took over the investigation and

prosecution. The preservation requests specifically demanded that the *whole* footage, about three

hours total, be preserved as potentially exculpatory. Nevertheless, when the video in question

was finally produced pursuant to the government's obligations under F. R. Crim. P. 16, it became evident that most of the video had been destroyed and its exculpatory portions edited out. The only portions of the video that were produced showed (i) when Mr. Addaquay entered the bank at around 3pm, (ii) when the police officers entered the bank at around 4:45pm, and (iii) when Mr. Addaquay was arrested. The additional time Mr. Addaquay was at the bank, almost 2 hours total, had been edited out and destroyed despite the repeated preservation requests.

Thus, on or about August 14, 2020 the defense filed a Motion to Restrict Certain Testimony Due to Destruction of Evidence [38] alleging constitutional violations of Mr. Addaquay's right to a fair trial based upon the destruction of the surveillance video. On or about March 2, 2021,  District Judge May ordered that an Evidentiary Hearing be held to get clarification on how the destruction of the video came about, what the video depicted, and who was responsible for its destruction.

The Evidentiary Hearing was conducted under Magistrate Judge Anand's supervision on September 22, 2021, and on December 10, 2021. Judge Anand then requested that both sides brief the findings from the hearing, resulting in the instant submission.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

Count Fourteen of the Indictment charges Defendant Thomas Addaquay with Bank Fraud in violation of 18 U.S.C. § 1344 and 2. This Count, although joined with the remaining counts of the Indictment, stands alone in several respects: it pertains only to Defendant Addaquay and does not include co-defendant Karabani; it is separated in time from the remaining counts of the Indictment by more than one year; and it alleges a wholly separate scheme than those contemplated by Counts One through Thirteen. Moreover, it is indisputable that Count Fourteen

requires proof that is entirely separate from what is required to sustain the rest of the Indictment. Lastly, the allegations in Count Fourteen and the initial arrest relating to said Count are based upon a State of Georgia, Cobb County prosecution, which was subsequently subsumed into the instant Indictment by the federal government.

On May 1, 2019 Thomas Addaquay was arrested at a local branch of Fifth Third Bank by Cobb County Police Department and charged with forgery, identity theft and obstruction of justice. Following his arrest, Addaquay retained undersigned counsel to represent him in that matter and motions were filed for the preservation of evidence including but not limited to any and all video footage at the bank. Moreover, counsel made a specific request via letter for the preservation of the surveillance footage at the bank from the moments just before a relevant, material unidentified third party first entered the bank at around 2pm until the time of Addaquay's arrest at around 5pm. Counsel also communicated directly with the bank in question seeking preservation of the video footage and received confirmation from the bank that it had been preserved.

Despite all the above-mentioned requests and assurances that the bank footage had been preserved, as part of its discovery obligations the government produced a starkly edited portion of the bank footage at issue. Namely less than ten minutes of footage when Addaquay is being arrested, rather than the three hours requested to be preserved by the defense. Following conversations between the undersigned counsel and the AUSA assigned to the case, it was revealed that the government did not have and could not produce the complete footage. The result of such revelations was the above-referenced Motion to restrict testimony and the Evidentiary Hearing.

# III.    SUMMARY OF TESTIMONY PROVIDED AT THE HEARING

At the Evidentiary Hearing, the Court heard testimony from Lakeshia Johnson (former bank manager at Fifth Third Bank), Tunisia Hopkins (defense counsel's process server), Michael Kramer (head of Fifth Third Bank's subpoena team), Samone Bey (Fifth Third Bank's subpoena specialist), Carlos Torres (Special Agent of the US Secret Service) and Breanna Shy-Ganzy (former Criminal Investigator of the Cobb County Sheriff's Department). For the sake of brevity and to assist in the Court's findings, the testimony of each of these witnesses is summarized below.

## A.    *LAKESHIA JOHNSON (Testified on September 22, 2021; pages 7-32)*

Ms. Johnson testified that she was the financial manager of the branch office where Thomas Addaquay was arrested. She diagramed the branch office and marked where some of the security cameras were located. She confirmed that at least one camera would have recorded anyone entering her office.[1] Despite claiming she recalled "some" of the facts surrounding Mr. Addaquay's arrest,[2] Ms. Johnson claimed not to remember a request for a $20,000 cashier check.[3] Importantly, however, Ms. Johnson confirmed that a third person was involved with Mr. Addaquay's transition at the bank on the day he was arrested. A photograph of the female in question was admitted into evidence as Defense Exhibit 1. According to Ms. Johnson, the female arrived first[4], was not referred to the bank by Addaquay[5] and claimed to be there because "a person wrote her a check, and she needed for it to get cleared or paid."[6] Ms. Johnson did not

---

[1] Pg. 10, ln. 19
[2] Pg. 11, ln. 19
[3] Pg. 14, ln. 22-24
[4] Pg. 17, ln. 1
[5] Pg. 16, ln. 18-23
[6] Pg. 17, ln. 19-20

remember how long the female was at the bank, but did confirm that she left prior to the police's arrival.[7] Moreover, Ms. Johnson recalls receiving a notice to preserve the video from defense counsel in May 2019 and claims to have sent it to the "back office."[8]

In terms of what transpired at the bank on the day in question, Ms. Johnson testified inconsistently and so it is difficult to ascertain the true sequence of events. At first she claimed that a teller approached her regarding a blockage in an account,[9] but then changed those facts to claim that she was the one who went to a teller to get a second opinion on the identification Addaquay presented.[10] As per Ms. Johnson's testimony, the unnamed female was the one who summoned Addaquay to the bank, because the bank could not negotiate the check she had.[11] Ms. Johnson also could not explain why Mr. Addaquay was at the bank for close to two hours when, according to her, a blockage on an account should take about 30 minutes to resolve.[12] Lastly, Ms. Johnson stated that she did not believe Mr. Addaquay approached the tellers upon his arrival at the bank.[13]

   B.    *TUNISHA HOPKINS (Testified on September 22, 2021; pages 33-37)*

Ms. Hopkins simply testified that she personally delivered and then mailed notices to preserve directly to Fifth Third Bank and to Ms. Johnson in May 2019. The relevant documents were admitted as Defense Exhibits 6, 7 and 9.

   C.    *MICHAEL KRAMER (Testified on September 22, 2021; pages 38-66)*

---

[7] Pg. 21, ln. 10-12
[8] Pg. 22, ln. 14-16
[9] Pg. 13, ln. 13-18
[10] Pg. 26, ln. 11-13
[11] Pg. 28, ln. 12-17
[12] Pg. 20, ln. 10-12
[13] Pg. 30, ln. 4-8

Mr. Kramer is currently employed at Fifth Third Bank and manages their subpoena team.[14] According to him, if law enforcement requests surveillance video from a bank branch they produce it in its entirety.[15] Per the video retention policy for the bank, the video in question is held and unedited for ninety (90) days. He acknowledged having received a request to preserve the surveillance footage from May 1, 2019 some time in July[16] but acknowledges that the "full video was not provided."[17] He testified that the bank "received a request for the relevant footage, and that's what was produced."[18] Mr. Kramer admits that the surveillance video was edited by the bank protection department,[19] but claims there are no records of when or how that happened.[20] According to Mr. Kramer, the bank's corporate investigator Kelly Newcomb had the video as part of her file.[21] No further explanation was forthcoming from Mr. Kramer as to why the bank protection department became involved, what Kelly Newcomb's role was in regard to the preservation or destruction of the video, or who made the determination of what constituted 'relevant footage' for purposes of the notice to preserve and subpoenas that were served upon the bank.

D.     *SAMONE BEY (Testified on September 22, 2021; pages 67-71)*

Ms. Bey testified she was the subpoena specialist of Fifth Third Bank in February 2020. She explained the process of looking for items responsive to a subpoena, and confirmed she sent

---

[14] Pg. 38, ln. 9-11
[15] Pg. 39, ln. 24-25
[16] Pg. 43, ln. 5-6
[17] Pg. 43, ln. 1-2
[18] *Id.*
[19] Pg. 47, ln. 9-10
[20] Pg. 47, ln. 22; Pg. 54, ln. 24
[21] Pg. 58, ln. 6-10

a "no account letter" to defense counsel on February 19, 2020, claiming she has been unable to locate the surveillance video in question.[22] The letter was admitted as Defense Exhibit 12.

E.    *CARLOS TORRES (Testified on September 22, 2021; pages 72-84)*

Special Agent Torres was the lead agent in the financial investigation against Mr. Addaquay.[23] He confirmed that a grand jury subpoena was served on Fifth Third Bank in May 2019,[24] which specifically requested the surveillance footage from the bank branch.[25] Yet, in response to the subpoena, the bank produced only documents and no video. According to his testimony, he followed up with the bank and eventually Kelly Newcomb produced the surveillance video which had already been edited.[26] Agent Torres testified that as of June 2019 he had already made efforts to preserve the video in question[27] and that he had requested "all pertinent information" from the bank.[28] However, when he finally received the edited version, which did not show any of the actions Mr. Addaquay is alleged in the Indictment to have taken while at the bank, he did not follow up or make any attempts to obtain a complete version of the video. He testified that he simply "assumed" he received what was "pertinent."[29] Therefore, according to Agent Torres, it was someone at the bank who decided what was 'pertinent' and edited the video accordingly; the lead investigative agent did not even bother to look further.  He

---

[22] Pg. 65, ln. 5-25
[23] Pg. 73, ln. 5-6
[24] Pg. 73, ln. 12
[25] Pg. 73, ln. 15-16
[26] Pg. 74, ln. 12
[27] Pg. 79, ln. 4-5
[28] Pg. 80, ln. 16-17
[29] Pg. 82, ln. 2-5

did concede that he wanted evidence of Mr. Addaquay filling out withdrawal slips as well as presenting a fraudulent identification and debit card.[30]

    F.    *BREANNA SHY-GANZY (Testified on December 10, 2021; pages 7-31)*

Ms. Shy-Ganzy was the officer who arrested and questioned Mr. Addaquay at the bank on May 1, 2019. According to her testimony, she also spoke to Lakeshia Johnson[31] and to Special Agent Robert Ricketts[32] among others. Ms. Shy-Ganzy, however, had no present recollection of the events surrounding Mr. Addaquay's arrest and had to rely upon her report (Defense Exhibit 4) repeatedly in order to testify.[33] Throughout her testimony, Ms. Shy-Ganzy answered "I do not recall" almost twenty times. Nevertheless, using her report to refresh her recollection, she confirmed the following critical facts: (i) Lakeshia Johnson never mentioned to the police the existence of the unnamed female who partook in the transaction;[34] (ii) Lakeshia Johnson told the police that Mr. Addaquay approached the teller and presented a drivers license and a Chase debit card;[35] and (iii) Lakeshia Johnson told the police that Mr. Addaquay had filled out a withdrawal slip while at the bank.[36] According to her testimony, she was trained in proper preservation of evidence as part of her duties for the Cobb County Sheriff's Department,[37] but yet claims she 'cannot recall' if she ever had to preserve evidence in another matter.[38]

---

[30] Pg. 81, ln. 1-17
[31] Pg. 13, ln. 1
[32] Pg. 17, ln. 18-21
[33] Pg. 14, ln. 21-25
[34] Pg. 16, ln. 11-17
[35] Pg. 13-14, ln. 19-25, 1-9
[36] Pg. 14, ln. 6-9
[37] Pg. 11, ln. 16-17
[38] Pg. 11, ln. 18-23

Based upon the testimony presented at the Hearing, several conclusions can be drawn about what happened to the surveillance footage at issue and why it was edited. Yet, none of them serve to appease the Court's concerns that Addaquay's rights to a fair trial have been violated, even if the blame for its destructions cannot be directly attributed to the government. At best, the government and its agents were negligent in the performance of their duties, acted in bad faith when they failed to secure the video following the defense's demand for its preservation. The lack of certainty that now exists with regard to the sequence of events on May 1, 2019, combined with all the documented requests the defense made for preservation of the bank footage as material to the case and potentially exculpatory in nature, all point to bad faith and support dismissal of Count Fourteen. Should the Court be disinclined to dismiss Count Fourteen, then the defense respectfully requests that the government's ability to present evidence at trial of things that would have been depicted in the destroyed portions of the video be severely limited and the jury instructed that it can draw a negative inference against the government for the destruction, or failure to preserve, the surveillance footage.

## IV.    ARGUMENT

Mr. Addaquay filed a Motion seeking to restrict the government's ability to use certain testimony at trial based upon on the fact that the Government failed to preserve, lost or destroyed, apparently exculpatory evidence that the Defendant specifically requested be preserved and which the Defendant would be unable to obtain by any other reasonably available means. This defect in the prosecution of COUNT FOURTEEN violates the prevailing notions of fundamental fairness guaranteed by the Fifth, Sixth and Fourteenth Amendments to the United

States Constitution and warrants dismissal of the referenced Count. Addaquay's claim of a violation of his right to a fair trial is therefore proper under the Due Process Clause of the Fifth Amendment. As a matter of the fundamental fairness which that provision guarantees, Addaquay is entitled to access to relevant and material evidence which is necessary for him to prepare his defense. See *Barnard v. Henderson*, 514 F.2d 744 (5 Cir. 1975); *United States v. Rojas*, 502 F.2d 1042 (5 Cir. 1974). Determination of a due process deprivation depends on "the materiality of the evidence, the likelihood of mistaken interpretation of it by government witnesses or the jury, and the reasons for its unavailability." *United States v. Vaughn*, 736 F.2d 665, 666 (11th Cir. 1984)

Now that a Hearing has been held to get some clarity on the destruction of the evidence in question, it is undeniable that Mr. Addaquay is entitled to the relief requested because (a) the destroyed video is clearly material and relevant to the allegations in Count Fourteen and would have certainly contributed to Mr. Addaquay's defense; (b) the government had a concomitant responsibility to try in good faith to preserve the video and to locate it once the defense made a request for it; (c) no comparable evidence exists to mitigate the destruction of the video; and (d) the likelihood of mistaken interpretation of the evidence relating to the destroyed video by government witnesses or the jury is very high. Each of these points in addressed in turn below.

A. **The Destroyed Video was Clearly Material and Relevant and Would Have Certainly Contributed to Mr. Addaquay's Defense**

The Constitution states only one commandment twice and it relates to Due Process. The Fifth Amendment tells the federal government that "No person shall be deprived of life, liberty or property without due process of law" and the Fourteenth Amendment makes the same promise

as it relates to the States. The Due Process Clause guarantees all criminal defendants fair procedures regardless of whether they are being prosecuted by the federal government or the state. Moreover, as explained by the United States Supreme Court, "criminal prosecutions must comport with prevailing notions of fundamental fairness. We have long interpreted this standard of fairness to require that criminal defendants be afforded a meaningful opportunity to present a complete defense." *California v. Trombetta,* 467 U.S. 479, 485 (1984)

In order to present a complete defense, a criminal defendant must be afforded all the protections guaranteed by the Bill of Rights including without limitation, the right to present and cross-examine witnesses as well as access to evidence. "A defendant has a constitutionally protected privilege to request and obtain from the prosecution evidence that is either material to the guilt of the defendant or relevant to the punishment to be imposed." *Brady v. Maryland*, 373 U.S. 83, 87 (1963). Additionally, "even in the absence of a specific request, the prosecution has a constitutional duty to turn over exculpatory evidence that would raise a reasonable doubt about the defendant's guilt." *United States v. Agurs*, 427 U.S. 97, 112 (1976). "Taken together, this group of constitutional privileges delivers exculpatory evidence into the hands of the accused, thereby protecting the innocent from erroneous conviction and ensuring the integrity of our criminal justice system." *Trombetta,* 467 U.S., at 489.

"In order to show that the loss of evidence by the government constitutes a denial of due process, the defendant must show that the evidence was likely to significantly contribute to his defense." *United States v. Brown*, 9 F.3d 907, 910 (11th Cir.1993). Notwithstanding the fact that the issue of materiality of suppressed or destroyed evidence usually happens *post hoc*, the standard for what constitutes evidence that is material to the case can be gleamed from those

cases and a preemptive ruling can be had in the form of dismissal when a defendant has the ability to bring the issue to the trial court's attention. *Cf. United States v. Trombetta*, 467 U.S. at 487 ("But when evidence has been destroyed in violation of the Constitution, the court must choose between barring further prosecution or suppressing - as the California Court of Appeal did in this case - the State's most probative evidence.") The touchstone of this analysis is therefore whether or not the missing evidence is material to the case, and once materiality is established, whether it was apparently or potentially exculpatory in nature. In order to rise to the level of a due process violation, evidence not preserved, lost or destroyed by the government "must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Trombetta*, 467 U.S. at 489.

In *United States v. Valenzuela-Bernal*, 458 U.S. 858 (1982) the Supreme Court explained that "to establish a denial of due process, the acts complained of must be of such quality as necessarily prevents a fair trial" and explained that a defendant "must at least make some plausible showing" of how the missing evidence "would have been both material and favorable to his defense." *Id.*, at 859. In that case, the Court went on to state:

> Having borrowed much of our reasoning with respect to the Compulsory
> Process Clause of the Sixth Amendment from cases involving the Due
> Process Clause of the Fifth Amendment, we have little difficulty holding
> that at least the same materiality requirement obtains with respect to a due
> process claim. Due process guarantees that a criminal defendant will be
> treated with 'that fundamental fairness essential to the very concept of
> justice. In order to declare a denial of it we must find that the absence of
> that fairness fatally infected the trial; the acts complained of must be of
> such quality as necessarily prevents a fair trial.'(citing *Lisenba v.
> California*, 314 U.S. 219, 236 (1941)).

*Id.*, at 876. Here, the trial has yet to take place, but the evidenced adduced at the Hearing supports the conclusion that the absence of the evidence in question will prevent a fair trial.

As stated above, the allegations in Count Fourteen pertain to an alleged scheme to defraud, whereby Mr. Addaquay visited a local bank to make a withdrawal using an allegedly false form of identification. The Indictment further states that Addaquay "approached the teller" and presented a fake ID in addition to a debit card. (¶22) We now know that the video in question would, among other things, discredit these allegations since it would show Addaquay never approached the teller but was instead greeted by a third party who summoned him to the bank and who was *not* a bank employee; together they met with the bank manager, and stayed at the bank for almost two hours before Addaquay was arrested. The surveillance video would have shown without a doubt that none of Addaquay's actions while at the bank were criminal in nature, and would have also shown how the unnamed female fled the bank just minutes before the police's arrival. The importance of being able to show Addaquay's innocent actions at the bank on video, and confirming the distorted version of events Ms. Johnson gave the police cannot be minimized and is not the subject of speculation.

Moreover, the government at no point acknowledged the presence of this third party at the bank or provide any information regarding her involvement in the case, nor did the government explain Ms. Johnson's failure to disclose those facts before the hearing. Only the video footage would confirm the presence of this third person, the length of time of the meeting, actions of the third party and the bank manager before the Defendant arrived and the fact that this was not simply a typical withdrawal at the teller as the Indictment would lead the jury to believe. There should be no question then that the bank footage at issue is material to the case

and favorable to the defense. Beyond that, it is of critical importance to Addaquay's Sixth Amendment rights as it would allow him to confront and cross-examine the key witness against him in Count Fourteen, Lakeshia Johnson, it would protect his right to refuse to testify if he so chooses, and would make it harder on the government to prove its case beyond a reasonable doubt.

B. **The Government Had a Concomitant Responsibility to Try in Good Faith to Preserve the Video and to Locate It Once the Defense Made a Request for It**

To ensure a criminal defendant's right to due process of law, fundamental fairness, and the right to present a complete defense, the government must preserve and produce evidence that is material to the case, and even more so when there is a possibility that such evidence is exculpatory in nature. This duty is further pronounced when the defendant specifically requests that such evidence be preserved, since then there is no question that the government has been put on notice. This notion of fundamental fairness is embedded in all the protections of the Bill of Rights, and is supported by relevant case law from the United States Supreme Court interpreting same.

Although it is acknowledged that there is no duty upon the government for disclosure of every single piece of evidence that comes across its investigatory path, the panorama changes when the defense has put the government on notice of the existence and potentially exculpatory nature of the evidence. Disagreement by the government about the nature of the evidence is no excuse for its suppression or destruction. "Although there is, of course, no duty to provide defense counsel with unlimited discovery of everything known by the prosecutor, if the subject matter of such a request is material, or indeed if a substantial basis for claiming materiality

exists, **it is reasonable to require the prosecutor to respond either by furnishing the information or by submitting the problem to the trial judge**. When the prosecutor receives a specific and relevant request, the failure to make any response is seldom, if ever, excusable." *United States v. Agurs*, 427 U.S. 97, 106 (1976)(Emphasis Supplied).

Thus, although as a general matter concerns of due process apply only to actions by the state, not by private citizens (see e.g., *Colorado v. Connelly,* 479 U.S. 157 (1986)), some circuits have found that the government has a concomitant responsibility to try in good faith to preserve important material and to locate it once the defendant moves for it in discovery. *Armstrong v. Collier*, 536 F.2d 72, 78 (5th Cir. 1976); *United States v. Bryant*, 439 F.2d 642, 651 (D.C. Cir. 1971); *United States v. Nabors*, 707 F.2d 1294, 1296 (11th Cir. 1983). In some cases it is sufficient if law enforcement *directed* a third party to destroy the evidence [*United States v. Beckstead,* 500 F.3d 1154, 1158 (10th Cir. 2007)] or *permitted* a third party to destroy the evidence under their control [*United States v. Cooper,* 983 F.2d 928, 932 (9th Cir. 1993)(finding due process violated where a waste disposal company, hired by the DEA to remove and store methamphetamine labs, destroyed items pursuant to company policy–not DEA direction)].

Similarly, there is reason to believe that the government's failure to disclose the fact that the evidence at issue was destroyed by a third party violates the government's statutory and ethical obligations under Fed.R.Crim.P 16. See e.g. *United States v. Laurent,* 607 F.3d 895, 900 (1st Cir. 2010) (noting district court found prosecution was required, under Federal Rule of Criminal Procedure 16, to disclose fact evidence was destroyed). Moreover, it is unlikely a court will look favorably upon a prosecutor who fails to disclose that evidence is no longer available.

And a prosecutor undoubtedly is ethically barred from suggesting or implying evidence, that is no longer available remains available.

Here, the defense satisfied its burden of materiality with the testimony adduced at the Hearing, and the government failed to show any efforts whatsoever to preserve the evidence despite the defense's request. In fact, quite the opposite became obvious when the lead agent in charge of the investigation acknowledged having received the chopped up video and did not even inquire as to how or why it had been edited when he had requested all 'pertinent' footage from the bank. The grand jury subpoena that was served upon Fifth Third Bank in May 2019 specifically demanded the surveillance footage, yet Agent Torres was apparently satisfied with the less than 10 minutes that were produced. The neglect of his actions is indisputable, as is the fact that but for his actions, the whole of the video would have ended up in the government's hands from the inception of the case. With that information in hand, the government would have been able to properly investigate the allegations in Count Fourteen, question Ms. Johnson as to why she lied to the police, and potentially even revisit its decision to join Count Fourteen with the remainder of the Indictment.

Doubtless, the government has failed to met its constitutional duties by failing to request, preserve and produce the video footage of the day Mr. Addaquay was arrested while visiting a local bank. Despite specific requests by undersigned counsel for its preservation, and despite the fact that the footage would be otherwise unavailable to the defense at trial, the government opted to ignore the issue, then to preserve only what pertained to the time of arrest, and did not even question what happened to the complete footage. Now, as trial looms near, the government seeks to use the bank manager as a key witness in support of the allegations in Count Fourteen despite

knowing she blatantly lied to the police, and turns a blind eye to the defense's need for this

footage in order to properly cross-examine said witness and defend against those allegations.

Since the Hearing left no doubt that the video was material and potentially exculpatory as

to the allegations of Count Fourteen, the question then becomes whether the government's

actions, or inactions, are enough to amount to bad faith. Currently, courts continue to struggle

with the definition of bad faith.[39] To that end, the concurring opinion of Justice Stevens in

*Arizona v. Youngblood*, 488 U.S. 51, 60-61 (1988) is enlightening:

> With these factors in mind, I concur in the Court's judgment. I do not, however, join the Court's opinion, because it announces a proposition of law that is much broader than necessary to decide this case. It states 'that unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law. '**In my opinion, there may well be cases in which the defendant is unable to prove that the State acted in bad faith, but in which the loss or destruction of evidence is nonetheless so critical to the defense as to make a criminal trial fundamentally unfair.**

(Emphasis Supplied)

This is precisely such a case. The defense cannot show that the government intentionally

destroyed the surveillance video; what the defense has shown is that the government and its

agents were grossly negligent in their duties to preserve evidence and in their investigation of the

---

[39] In June 1998 the Court in Rodriguez v. State, No. 03-97-00180-CR, 1998 WL 303873, at *4 (Tex. Ct. App. June 11, 1998), reaffirmed that "[w]hat constitutes "bad faith" is not altogether clear from the case law."

See generally Sarah M. Bernstein, Note, Fourteenth Amendment-Police Failure to Preserve Evidence and Erosion of the Due Process Right to a Fair Trial, 80 J. CRIM. L. & CRIMINOLOGY 1256 (1990); Albert M. T. Finch, III, Note, "Oops! We Forgot to Put it in the Refrigerator":DNA Identification and the State's Duty to Preserve Evidence, 25 J.MARSHALL L. REV. 809 (1992); B. W. Gordon, Jr., Note, Constitutional Law-Due Process-Failure of Police to Preserve Evidence Held Not to Be a Denial of Due Process of Law Absent Defendant's Showing Bad Faith on Part of Police: Arizona v. Youngblood, 109 S. Ct. 333 (1988), 20 CUMB. L. REV. 211 (1989); Linda Gensler Kaufmann, Arizona v. Youngblood, State Advantage in Criminal Proceedings: the Ghost Is Real and the Haunting Continues, 14 OKLA. CITY U. L. REV. 665 (1989)

allegations in Count Fourteen.  Under the circumstances, this utter disregard for Addaquay's

rights to a fair trial and access to evidence is enough to warrant a presumption of bad faith.

## C.  No Comparable Evidence Exists to Mitigate the Destruction of the Video

According to the Supreme Court's analysis in *Trombetta*, a necessary prong to finding a

Due Process violation for destruction of evidence is that the evidence has to "be of such a nature

that the defendant would be unable to obtain comparable evidence by other reasonably available

means." *Trombetta,* 467 U.S. at 489. The question then becomes what constitutes 'comparable

evidence' under the circumstances of this case.

In *United States v. Zaragoza-Moreira,* 780 F.3d 971 (9th Cir. 2015), involving a

destroyed videotape of defendant's conduct at a port of entry, the Ninth Circuit rejected the

argument that defendant's testimony at trial concerning her conduct would provide comparable

evidence because this would run afoul of the defendant's "Fifth Amendment right against self-

incrimination, by essentially forcing her to testify in her own defense." *Id*. at p. 981. The Ninth

Circuit then went on to say "[n]otwithstanding the obvious Fifth Amendment implications

triggered by the government's argument, **[defendant's] self-serving testimony, especially in

light of her substantial cognitive disabilities, would not be comparable to video footage that

recorded her actions while in the pedestrian line.**" (Emphasis Supplied) See also: *United

States v. Corsmeier,* 2007 WL 4224366, *7 (S.D. Ohio 2007)(agreeing with defendant that her

own testimony about a conversation on a missing tape, if she could recall the content, would not

be comparable evidence without specifying why); *United States v. Cooper*, 983 F.2d 928 (9th

Cir. 1993)(court properly rejected prosecution offer to stipulate to jury instruction establishing

some, but not all, of what defense wanted to show from missing evidence where impact of actual

introduction of evidence significantly outweighed impact of stipulation). Thus, as the Supreme Court wisely stated in its *post hoc* analysis in *Agurs*: "additional evidence of relatively minor importance might be sufficient to create a reasonable doubt." *Agurs,* 427 U.S. at 112-113.

Similarly, in *United States v. Bohl*, 25 F.3d 904 (10th Cir. 1994), government agents failed to preserve steel tower legs whose chemical composition was central to the case against the defendants. The tower legs were destroyed after the government was explicitly and repeatedly placed on notice that the defense wanted the legs preserved and believed they were exculpatory. *Bohl*, 25 F.3d at 911. There, the court concluded that "the government denied [the defendants] a meaningful opportunity to present a defense by intentionally disposing of potentially exculpatory and highly probative evidence in the face of [the defendants'] repeated requests for pretrial access to that evidence." *Id*. at 906. Similarly, in *United States v. Cooper*, 983 F.2d 928 (9th Cir. 1993), government agents seized laboratory equipment from the defendant but before the equipment was examined it was destroyed as part of routine procedure. There, the government left unchallenged the district court's conclusion that the police acted in bad faith by allowing the equipment to be destroyed while assuring the defendant and his attorney that it was being held as evidence. The court therefore concluded "**that no alternative matches the potentially powerful exculpatory evidence destroyed by the government. The appropriate remedy is dismissal of the indictment**." (Emphasis Supplied) *Id*. at 929.

Here, cross-examination of Ms. Johnson would not be enough to amount to 'comparable evidence' because the video is itself required for cross-examination. "It is of no consequence that the falsehood bore upon the witness' credibility rather than directly upon defendant's guilt. A lie is a lie, no matter what it's subject, and, if it is in any way relevant to the case, the district

attorney has the responsibility and duty to correct what he knows to be false and elicit the truth. . . . That the district attorney's silence was not the result of guile or a desire to prejudice matters little, for its impact was the same, preventing, as it did, a trial that could in any real sense be termed fair." *Napue v. Illinois*, 360 U.S. 264, 269 (1959)(citing *People v. Savvides*, 1 N. Y. 2d 554, 557; 136 N. E. 2d 853, 854-855; 154 N. Y. S. 2d 885, 887).

Beyond the corroboration that the video would provide for Addaquay's version of events that day, the fact that he was summoned to the bank and greeted upon his arrival by someone who was *already there* is a critical element here. The complete video, starting before Mr. Addaquay's arrival at the bank and ending with his arrest, would've shown how long the greeter waited for him and that person's interactions at the bank prior to his arrival. Again, the fact that Mr. Addaquay was present at the bank and knows first hand what the video would have shown should not be overlooked, but neither should the fact that there were things going on at the bank prior to his arrival that he would not be able to testify to. Thus, even if Addaquay were to take the stand, which he should not be forced to do under the Fifth and Sixth Amendments, his testimony would not be 'comparable evidence' because he was not there when the unnamed female who summoned him arrived.

Lastly, there is no reason to believe that the jury would give credence to Addaquay's version of events as opposed to those of the bank manager. It is only the video itself what will protect Addaquay's right to present a complete defense, right to confront and properly cross-examine the witnesses against him, and guarantee the fairness of the trial. The video would therefore serve to either impeach or corroborate the testimony of the government's key witness, corroborate Mr. Addaquay's version of events or even make it unnecessary for him to take the

stand, and provide the jury with documentary evidence subject to their interpretation rather than having to rely on their instinctive judgment regarding the credibility of the bank manager as compared to a criminal defendant. Therefore, absent the complete video, the defense remains unable "to obtain comparable evidence by other reasonably available means." *Trombetta*, 467 U.S. at 489.

D. **The Likelihood of Mistaken Interpretation of the Evidence Relating to the Destroyed Video by Government Witnesses or the Jury is Very High**.

"The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend." *Napue v. Illinois*, 360 U.S. 264, 269 (1959). Also, the Supreme Court in *Kirby* v. *United States,* 174 U.S. 47, 55-56 (1899), referred to the right of confrontation as "[o]ne of the fundamental guarantees of life and liberty," and "a right long deemed so essential for the due protection of life and liberty that it is guarded against legislative and judicial action by provisions in the Constitution of the United States and in the constitutions of most if not of all the States composing the Union." And in *Pointer v. Texas*, 380 U.S. 400, 404 (1965) further explained the importance of cross-examination as follows: "It cannot seriously be doubted at this late date that the right of cross-examination is included in the right of an accused in a criminal case to confront the witnesses against him. And probably no one, certainly no one experienced in the trial of lawsuits, would deny the value of cross-examination in exposing falsehood and bringing out the truth in the trial of a criminal case."

Under this framework then, it is self-evident that denying a criminal defendant access to evidence which would allow him the opportunity to properly cross-examine a key prosecution

witnesses is in itself a denial of his right to present a complete defense and a denial of Due Process. Not to mention that it would protect his right not to testify at trial and truly place the burden of proving the case beyond a reasonable doubt squarely upon the government. Moreover, since Count Fourteen is separate from the other thirteen counts in the Indictment in every respect, it is possible — and in fact quite likely — that there will be a spill over effect such that if the jury believes Addaquay guilty of the remaining counts, they may find him guilty of Count Fourteen also without the necessary proof. The surveillance video would have also mitigated that spill over effect. A video is not be subject to interpretation or speculation by the jury, it would be believed in the same way a recorded telephone call is believed.

Therefore, Court Fourteen should be dismissed, or at the very least the government's ability to elicit testimony regarding the events of May 1, 2019 be severely limited, because this is one of those cases where the government's actions should be punished and it deterred from taking such a cavalier attitude towards a defendant's right to access to evidence and a fair trial.

## V.    CONCLUSION

Mr. Addaquay respectfully requests that this Court dismiss Count Fourteen of the Indictment, or in the alternative severely limit the government's ability to elect testimony regarding the subject matter of the destroyed evidence as requested in the Motion.

Dated: January 15, 2021                    Respectfully Submitted,

/s/ Rodney Williams

Law Office of Rodney Williams, LLC
315 W. Ponce De Leon
Suite 915
Decatur, Georgia 30030
notguilty@attyrodneywilliams.com

## **CERTIFICATE OF SERVICE**

I served this document today by filing it using the Court's CM/ECF system, which automatically notifies the parties and counsel of record.

Respectfully submitted this 15$^h$ day of January, 2022.

/s/ Rodney Williams
Rodney Williams
Lead Counsel for Defendant
State Bar No.: 765415

Law Office of Rodney Williams, LLC
315 W. Ponce De Leon
Suite 956
Decatur, Georgia 30030
notguilty@attyrodneywilliams.com